UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GEORGE DE LOS REYES,

                          Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration,

                    Defendant.

Case No.: 12-CV-02048-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

    Plaintiff George De Los Reyes ("Reyes") filed this action under § 205(g) of the Social Security Act (the "Act") as amended, 42 U.S.C. § 405 (g), to review the final decision of the Commissioner of Social Security (the "Commissioner") who denied him social security

         *{JGM}*

disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") (collectively "Benefits"). For the reasons set forth below, the Commissioner's findings on Reyes's disabilities, considering the record as a whole, are supported by substantial evidence and the decision of the Commissioner should be affirmed.

## Procedural Background

On or about May 1, 2009, Reyes filed an application for Benefits alleging an onset date of March 1, 2006. The application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## Factual Background

Reyes is currently thirty-eight years old. (Admin. R. at 44.) He attended school for ten years and obtained a GED. (Admin. R. at 45.) From first to eighth grade, Reyes attended special education classes for a speech impediment. (Admin. R. at 50-51.) His past relevant work experience includes cook helper, cleaning at a restaurant, dishwasher and hand packager. (Admin. R. at 48 and 58.) Reyes has not been involved in a successful work attempt since March 1, 2006. (Admin. R. at 46.) Reyes alleges an inability to work due to his impairments of bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), post traumatic stress disorder ("PTSD"), depression and anger issues. (Admin. R. at 14 and 72.) Reyes last met the insured status requirements on June 30, 2010. (Admin. R. at 14.)

I.  Hearing Testimony

The ALJ held a hearing on May 3, 2011, on Reyes's appeal of the denial of his application for Benefits. Reyes was present at the hearing and testified. At the hearing, the ALJ noted that based on Reyes's 2005 and 2006 earnings, the onset date should be amended to March

1, 2006 instead of July 1, 2005, as initially alleged. (Admin. R. at 45-49.) Accordingly, the date was amended on the record.

## II.   Claimant/Lay Witness Testimony

### A.  Reyes's Testimony

On examination by the ALJ, Reyes testified that he did not "really remembered" who he worked for as a cook in 2005-2006, or when he started or quit that job. (Admin. R. at 46.) Reyes testified that he last worked in 2006 in a café where he cooked and cleaned. (Admin. R. at 48.) Reyes testified that he is unable to perform his last work because he "can't deal with people very well . . . [he has] anxiety attacks . . . [he does not] really know." (Admin. R. at 46.) Reyes also stated that "maybe" he would be able to do a job where he would not have to be around many people. (Admin. R. at 46.)

On examination by Ms. Dyer, Reyes's attorney, Reyes stated that he has terrible nightmares about his childhood. (Admin. R. at 49.) Even when taking medication, he still has a few night terrors about his abusive grandfather and wakes up periodically through the night. (Admin. R. at 49.) Reyes testified that he does nothing else during the day but sleep until his wife comes home from work. (Admin. R. at 49.) Everyday, Reyes gets his children up for school at 7:00 a.m., then he goes back to sleep at 8:00 a.m., and wakes up by 2:00 p.m. (Admin. R. at 49.) Reyes stated that he "can't leave the house without [his] wife" because he "just [has] no urge to be around people", he "gets anxiety attacks and [has] to take medication for that, too." (Admin. R. at 51.) According to Reyes, the medication he takes calms his nerves and makes him drowsy. (Admin. R. at 51.)

Reyes "is not sure" what medication he takes because his wife lays his medication out for him at nights and in the mornings, but he believes he takes Klonopin or Clonidine. (Admin. R. at

50, 52.)  His wife also leaves notes for him around the house to do things but he has "no urge to do nothing but really sleep" so he does not do them.  (Admin. R. at 52.)  Reyes testified that he had problems with authority and co-workers in his past work experiences because he does not "like to be told what to do".  (Admin. R. at 52.)  Reyes stated that "working with people, being around people" is what would stop him from being a dishwasher at a restaurant.  (Admin. R. at 51.)  Reyes is also "unsure" if he could do a job for forty hours a week where supervision is minimal.  (Admin. R. at 50.)

      *B.  Julie Trevino's Testimony*

      Reyes's foster mother, Julie Trevino ("Trevino"), also testified at the hearing.  Trevino began fostering Reyes when he was approximately 15 years old.  (Admin. R. at 54.)  Trevino noticed that Reyes was "fine as long as he was at home and around people that he was familiar with".  (Admin. R. at 55.)  According to Trevino, school was a problem for Reyes as he was insecure in public and had a "tough time any time it was a large crowd."  (Admin. R. at 56.)  Trevino stated that Reyes "had some anxiety" when they started going to church before "[Reyes] got comfortable."  (Admin. R. at 56.)  Although, "[Reyes] never really got totally comfortable, but he knew he had to go [to church] and he would."  (Admin. R. at 56.)

      Currently, Trevino visits Reyes about once a week to see Reyes's children and sometimes Reyes and his family at tend barbecues at Trevino's house. (Admin. R. at 55.)  Trevino has seen that Reyes's behavior and ability to adapt has gotten worse although she "does not know if that is because maybe she did not notice it . . . ."  (Admin. R. at 56.)  Trevino testified that Reyes was "pretty good" with her but that he had "a real though time with" any other authority.  (Admin. R. at 57.)

*{JGM}*

Trevino also authored a letter to "To Whom it May Concern" on June 6, 2009, stating that when she took Reyes in, he "fit very well into [their] home and was very well behaved." (Admin. R. at 169.)  It did not take Trevino very long to notice that Reyes had anger issues and an antisocial problem.  (Admin. R. at 169.)  Reyes would be fine as long as he was at home but his issues with anger would evolve outside the home.  (Admin. R. at 169.)  Trevino stated that when Reyes was younger, she "was not aware of Reyes's problem and abusive childhood to help him overcome his problems."  (Admin. R. at 169.)  She also notes that Reyes gives his children a "loving and more functional home."  (Admin. R. at 170.)

II.    Vocational Expert Testimony

Frank Lucas ("Lucas"), vocational expert, testified at the hearing and answered questions from the ALJ and Reyes's attorney.  First, however, Lucas asked Reyes if he remembered "working in '98 for a company or a person, James R. Moore? Was that a restaurant?" and Reyes replied that it was.  (Admin. R. at 58.)  Then, Lucas asked Reyes if "Newell Potatoes [is] out of Tulelake . . . and what did [Reyes] do with them."  (Admin. R. at 58.)  Reyes answered that it is a "potato co-op" and that he "processed potatoe s."  (Admin. R. at 58.)  Lucas characterized Reyes's past relevant work of cook, cook helper, dishwasher, and hand packager as medium level work.  (Admin. R. at 58.)

The ALJ asked Lucas whether a person of thirty-six years of age, with a high school or GED education, with a past relevant work experience similar to Reyes's and limited to unskilled work; who should have no public contact but could have occasional co-worker contact although no teamwork and should have minimal supervisory contact, would be able to perform Reyes's past relevant work.  (Admin. R. at 59.)  Lucas indicated such an individual would not be able to perform Reyes's past relevant work, other than hand packager jobs, but that there were other jobs

in the local or national economy that such an individual could perform. (Admin. R. at 59.) Lucas specifically identified cleaner, laundry worker, and recycler as possible jobs. (Admin. R. at 59.)

The ALJ then pose a second hypothetical: "Same person with the same limitations I've given in the first hypothetical, but in addition to that, this person would miss two or more days of work per month on a routine basis." (Admin. R. at 60.) In response, Lucas indicated that under this hypothetical the individual's limitations would rule out competitive employment, in accordance with the Dictionary of Occupational Titles ("DOT"), "other than [for] absenteeism" which the DOT does not describe. (Admin. R. at 60.)

On examination by Ms. Dryer, Mr. Lucas indicated that all those jobs are simple tasks, "basically doing the same thing over and over again." (Admin. R. at 60.) He also stated that a lack in "procedure, sequence or pace" could disqualify that person from employment. (Admin. R. at 61.) Before concluding, Ms. Dyer asked Lucas if competitive employment would be "ruled out" for the person in the hypothetical if "due to medication and to interrupted sleep at night, the person needed to sleep four to five hours a day." Lucas answered it would rule out employment. (Admin. R. at 62.)

III.   Claimant/Lay Witness Evidence

In a Function Report ("Report"), Reyes indicated that he takes care of his three kids and does "about all of the basic things that go with caring for them." (Admin. R. at 146.) Reyes stated that for as long as he can remember he "has never been able to sleep 8 hours a night and [he] has really bad nightmares about when [he] was a kid." (Admin. R. at 146.) Reyes completes meals for him and his family daily in about one hour. (Admin. R. at 147.) He cleans the house and does laundry, which takes most of his day when he does it once a week. (Admin.

R. at 147.) He does not do yard work because he does not like to be outside. (Admin. R. at 147.) Reyes does not like to go out alone because "he is afraid that [he will] start a fight with people" and relies on his wife when has to go anywhere (Admin. R. at 148-149.) Reyes reported that he "hate[s] being around anybody." (Admin. R. at 150.)

In the Report, Reyes did not identify any hobbies or interests or how his illness or condition changed that. (Admin. R. at 149.) He stated that he does not follow written instructions well "at all", and that he "always forget what [he is] told" when given spoken instructions. (Admin. R. at 149.) Reyes has been fired or laid off from a job before because "he did not like being told what to do" and "did not have patience at all." (Admin. R. at 151.) Reyes does not handle stress "very good at all," he prefers routines where "everything is the same from the time [he] gets up." (Admin. R. at 151.) Reyes represents to have "very bad anxiety" although his alleged impairment or condition does not represent a physical limitation or pose problems for his personal care. (Admin. R. at 146, 151.)

Reyes also submitted a letter explaining his family background. (Admin. R. at 171.) Reyes's biological mother was addicted to heroin and did not take care of him. (Admin. R. at 171.) At age nine, Reyes went to live with his grandfather before his mother passed him around to different families. (Admin. R. at 171.) Reyes's grandfather was mentally and physically abusive of him and he never knew who his father was. (Admin. R. at 171.)

Reyes's wife, Teresa De Los Reyes ("Teresa"), completed a form on June 2, 2009, about Reyes's condition and her responses are very similar to those in Reyes's report. (Admin. R. at 161-168.) Teresa has known Reyes for ten years and they spend time together watching television. (Admin. R. at 161.) She said that Reyes "was able to get out more." (Admin. R. at 161-162.) Although Teresa leaves notes for Reyes on things to do, they still do not get done.

(Admin. R. at 163.) Reyes goes shopping for food once a month late at night when no one is in the store. (Admin. R. at 164.) He does not like to go out and do things "any more without Teresa." (Admin. R. at 165, 166.)

IV.  Medical Evidence

Jon McKellar, M.D., ("Dr. McKellar"), examined Reyes at Klamath Family Practice Center on repeated occasions from November 21, 2008 to April 16, 2009. (Admin. R. 222-233.) In the treatment record dated November 21, 2008, Dr. McKellar pointed to bipolar disorder and depression. (Admin. R. at 226.) Dr. McKellar noted Reyes's use of marijuana and that Reyes did not smoke cigarettes and did not exercise. (Admin. R. at 226.) The treatment record dated December 5, 2008, varies from the others in that Dr. McKellar noted that Reyes was "sleeping better." (Admin. R. at 225.)

Russell S. Shapiro, P.M.H.N.P., ("Shapiro"), interviewed Reyes on January 9, 2009. (Admin. R. at 215.) Shapiro reported that Reyes presented a wide array of troubling behaviors highlighting a severe history of trauma dating back to poor parenting and a dysfunctional home. (Admin. R. at 218.) Reyes's depressed mood dates back to those years. (Admin. R. at 218.) Shapiro noted that during the interview, Reyes was able to stop his hyperactivity long enough to focus and concentrate on the tests at hand. (Admin. R. at 218.) Shapiro indicated that Reyes's elevated mood and high risk behavior history all suggest concern for a bipolar spectrum disorder to be assessed over time. (Admin. R. at 218.) He noted Reyes's unemployment, financial, marital and parenting situations as severe stressors. (Admin. R. 219.) On January 23, 2009, Shapiro diagnosed a Global Assessment of Functioning[1] ("GAF") score of 43. (Admin. R. 219.)

---

[1]  A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or

Then, in a progress note dated January 28, 2009, he indicated a GAF score of 48.  (Admin. R. at

214.)

Reyes transferred care from Shapiro to Cheryle-May Ramirez, PMHNP, ("Ramirez"), a

Psychiatric/Mental-Health Nurse Practitioner, who treated Reyes from April 9, 2009, to

November 18, 2010.  (Admin. R. at 181 and 270-294.)  Ramirez saw Reyes for the first time in

March 2009 for mental issues although no treatment was listed on the record.  (Admin. R. at

181.)  Ramirez prescribed Reyes Clonodine for nightmares; Methilin for ADD;  Oxcarbazepine

for anger; and Trazadone for sleep and depression.  (Admin. R. at 181.)  Reyes reported

sleepiness as result of taking Oxcarbazepine, and sleep and depression from taking Trazadone.

(Admin. R. at 181.)  Other doctors had also prescribed Propranolol for anxiety, which causes

drowsiness, and Simvastatin, although Reyes is "not sure" why he was prescribed Simvastatin.

(Admin. R. at 181.)

On April 9, 2009, Ramirez did a Psychiatric Evaluation of Reyes.  On that evaluation

Reyes stated that he was able to function until several years ago when he decided that he would

become a stay-at-home father.  (Admin. R. at 291.)  Reyes quit his job as it was becoming more

and more difficult for him to continue working secondary to his anger.  (Admin. R. at 291.)  He

reported his sleep got better with Lamictal and he stated he was healthy.  (Admin. R. at 291-

292.)  Reyes denied any addictions although he occasionally smokes marijuana and has a

---

environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical
Manual of Mental Disorders* ("DSM–IV"), at 32 (4th ed. 2000). A GAF score in the range of 41–
50 indicates serious symptoms or any serious impairment in social, occupational, or school
functioning (e.g., unable to keep a job). DSM–IV, at 32. A GAF score in the range of 31–40
indicates "some impairment in reality testing or communication (*e.g.*, speech is at times illogical,
obscure, or irrelevant) or major impairment in several areas such as work or school, family
relations, judgment, thinking or mood." DSM–IV, at 32. A GAF score in the range of 51–60
indicates moderate symptoms or moderate difficulty in social, occupational, or  school
functioning (*e.g.,* few friends, conflicts with peers or coworkers). DSM–IV, at 34.

previous history of multiple drug abuse. (Admin. R. at 293.)  Reyes appeared adequately groomed and was cooperative during the interview.  (Admin. R. at 293.)  He also appeared depressed and his affect was very guarded.  (Admin. R. at 293.)  Ramirez noted that Reyes appeared to be an accurate historian with memory intact although not formally tested.  (Admin. R. at 293.)  Reyes expressed willingness to seek help for his problem with anger.  (Admin. R. at 293.)  Ramirez characterized Reyes's prognosis as fair to good.  (Admin. R. at 293.)  Ramirez diagnosed Reyes with bipolar disorder, PTSD, chronic, panic disorder with agoraphobia, and ruled out ADHD.  (Admin. R. at 293.)  Ramirez gave a GAF score of 40.  (Admin. R. at 293.)

On April 16, 2009, Dr. McKellar noted in a report that Reyes had quit drugs and smoking cigarettes "x2mo".  (Admin. R. at 223.)  Reyes stated to feel depressed and to have back pain. (Admin. R. at 223.)  On April 23, 2009, Reyes reported to Ramirez still feeling depressed and with difficulty in modulating emotions.  (Admin. R. at 290.)  Ramirez reported an unchanged assessment of progress and the GAF score of 40 was unchanged.  (Admin. R. at 290.)  Ramirez also increased the dose of Lamictal to 200mg.  (Admin. R. at 290.)  On May 15, 2009, Ramirez reported Reyes relapsed on alcohol abuse and he appeared mildly intoxicated during the examination.  (Admin. R. at 289.)  The progress assessment and GAF score remained unchanged.  (Admin. R. at 289.)  On May 20, 2009, Reyes was able to stop alcohol use and his insomnia improved.  (Admin. R. at 288.)  Again, Ramirez assigned a GAF score of 40.  (Admin. R. at 288.)  On June 4, 2009, Reyes's sleeping and anger kept improving.  (Admin. R. at 287.)  Yet, Ramirez's report remained similar to last one, with the same GAF score of 40.  (Admin. R. at 287.)

Gregory A. Cole, Ph.D., ("Dr. Cole"), performed a psychodiagnostic evaluation of Reyes on August 28, 2009.  (Admin. R. 235.)  By that time, Reyes had receive treatment sessions from

a mental health professional for symptoms of bipolar disorder, PTSD, ADHD, and a panic disorder with symptoms of agoraphobia. (Admin. R. at 236.) Reyes reported that his last use of alcohol was in July 2009, and his last use of methamphetamine was when he was thirty years of age. (Admin. R. at 236.) He also reported that he used cocaine and hallucinogens two times in his lifetime, and his last use of marijuana was in February 2009. (Admin. R. at 236.) Reyes reported to use methamphetamine on a daily basis during specific periods of time and to smoking ½ pack of cigarettes a day at those times. (Admin. R. at 236.) According to Reyes, his last use of methamphetamine was when he was thirty years old. (Admin. R. at 236.) Throughout the evaluation, Dr. Cole observed Reyes was engaged and cooperative. (Admin. R. at 238.) Dr. Cole observed Reyes to be "oriented three times"; making "good" eye contact; with good mood and his affect was congruent with his verbalization. (Admin. R. at 237.) Reyes's "insight and judgment were fair" and he self-reported to have "felt down" periodically "for three years" and with mood swings. (Admin. R. at 237.)

Dr. Cole noted problems with attention and concentration while completing simple multi-step tasks although with no errors, and indicated Reyes exhibited slightly below average intellectual capabilities. (Admin. R. at 237-238.) Dr. Cole assessed Reyes's immediate and delayed memory capacity as below average. (Admin. R. at 238.) Reyes reported problems with anger but no problems with pain or any paranoid ideations, or any auditory or visual hallucinations. (Admin. R. at 238.) Reyes self-reported "severe levels of depression symptomatology." (Admin. R. at 238.) Dr. Cole considered Reyes's stress to be associated with his social environment, occupational problems, and economic problems. (Admin. R. at 240.) Dr. Cole diagnosed Reyes with bipolar disorder, most recent episode depressed; panic disorder without agoraphobia, and history of amphetamine and cannabis dependence, but ruled out

ADHD, combined type.  (Admin. R. at 239.)  At that time, Dr. Cole did not believe Reyes currently met full behavioral criteria for a diagnosis of PTSD.  (Admin. R. at 240.)  Dr. Cole assessed a GAF score of 54.  (Admin. R. at 240.)

According to Dr. Cole, if Reyes pursues a vocational placement in the near future, his level of anxiety, tendency to give up easily on tasks, and problems interacting with others, would be the primary factors that would impact his overall level of vocational success, presumably.  (Admin. R. at 240.)  Dr. Cole also stated that Reyes could manage money independently with reservations noted based on his history of substance abuse.  (Admin. R. at 240.)  On August 29, 2009, Reyes met with Paul Rethinger, Ph.D., ("Dr. Rethinger") and reported decrease in anger and improved emotional control.  (Admin. R. at 264.)

On September 4, 2009, disability analyst Marjorie E. Garcia ("Garcia") reported that Reyes is "capable of performing past work as dishwasher/food prep."  (Admin. R. at 173.)  She did not mark that Reyes meets any of the listed adverse profiles.  (Admin. R. at 174.)  Reyes alleged "trouble getting along well with others, aggression, and panic attacks."  (Admin. R. at 175.)  Garcia did not note "pain, fatigue, or nervousness" as alleged symptoms and marked that Reyes's credibility finding was documented in file.  (Admin. R. at 175.)

Dorothy Anderson, Ph.D., ("Dr. Anderson"), a state agency non-examining psychological consultant, performed a psychiatric review evaluation on September 4, 2009, assessing from July 1, 2005, to present.  (Admin. R. at 242.)  Dr. Anderson found no mental impairment that required referral to another medical specialty.  (Admin. R. at 242.)  She noted organic mental disorders, affective disorders, anxiety-related disorders, and substance addiction disorders.  (Admin. R. at 242.)  Dr. Anderson diagnosed Reyes with ADHD disorder, bipolar disorder, panic disorder without agoraphobia, and polysubstance dependence as a substance addiction disorder.  (Admin.

R. at 243-247.)  She also noted a moderate degree of limitation in maintaining concentration, persistence, or pace, and difficulty in maintaining social functioning with only a mild limitation on daily activities.  (Admin. R. at 252.)  Dr. Anderson noted that Reyes did not seek or receive treatment until December 2008, and determined the evidence did not establish the presence of the "C" criteria of the Listing of Impairments of the Social Security Administration ("Listing"). (Admin. R. at 253-254.)

In assessing the consistency of the evidence and material conflicts, Dr. Anderson reported that Reyes's statements were not fully credible.  (Admin. R. at 254.)  Her medical conclusion was: Mood Disorder Insight ("MDI") of bipolar disorder; panic d/o without agoraphobia; ADHD, combined type; and, polysubstance dependence "do not M/E 12.04, 12.06, 12.02, or 12.09 but do prevent [Reyes] from performing a full range of mental tasks."  (Admin. R. at 254.) Reyes is capable of "sustaining SRT in a low-production, low interaction setting."  (Admin. R. at 254.)  The Functional Capacity Assessment reflected that Reyes has attention/concentration deficits which would require breaks every two hours in order to sustain/persist with tasks. (Admin. R. at 258.)  Reyes also demonstrated memory impairments.  (Admin. R. at 258.)  Dr. Anderson reported those reasons would make Reyes "not capable of performing complex/detailed tasks, but is able to sustain simple, routine tasks with normal breaks."  (Admin. R. at 258.)  The assessment on social interaction notes that Reyes should not have contact with the general population or more than occasional contact with co-workers to avoid exacerbating the symptoms; some supervision is suggested to monitor/maintain persistence.  (Admin. R. at 258.)  The assessment on adaptation notes no significant limitations.  (Admin. R. at 258.)

By September 16, 2010, Ramirez noted that Reyes's depression was improving and he reported a significant decrease in anger.  (Admin. R. at 271.)  Ramirez's diagnosis remained the

same.  (Admin. R. at 271.)   On September 23, 2009, Ramirez noted no progress regarding Reyes's sleep, although they were able to discuss paranoia.  (Admin. R. at 286.)  Reyes appeared normal but continued to be depressed and angry.  (Admin. R. at 286.)  Ramirez noted that Reyes met the criteria for ADHD and again assigned a GAF score of 40.  (Admin. R. at 286.)

By September 23, 2009, Dr. Rethinger noted that Reyes's anger remained improving and it was noted that Trazodone was not working for sleep.  (Admin. R. at 264.)  On November 5, 2009, Reyes reported that he was still not sleeping, he was able to control his anger better but was still distressed, and that he felt angry all the time.  (Admin. R. at 264.)  The review of totality of medical evidence of record ("MER") supported the initial psychiatric review technique form/mental residual functional capacity form ("PRTF/MRFC").  (Admin. R. at 264.)  The medical impairments noted by Dr. Rethinger were bipolar disorder, panic complaints without agoraphobia, ADHD, and history of amphetamine and cannabis dependence.  (Admin. R . at 264.)

On November 5, 2009, Ramirez reported that Reyes "was able to see a different way of managing emotions"; although his evaluation remained the same.  (Admin. R. at 284.)  On a different report but with the same date, Ramirez reported Reyes was still not sleeping, that he was able to control his anger better, although he feels distressed, and was "discouraged that he can't get over this quickly."  (Admin. R. at 285.)  At that time, there was no progress regarding sleep, but Reyes verbalized good insights of his childhood trauma.   (Admin. R. at 285.)  Ramirez's evaluation remained analogous to previous ones and with the same GAF score of 40.  (Admin. R. at 285.)  On November 20, 2009, Dr. Rethinger completed a Mental Summary Finding based on Shapiro's evaluations, which supported affirmation of the initial PRTF/MRFC

findings.  (Admin. R. at 264.)   The findings note that Reyes did not alleged worsening of his condition and that he continued cognitive behavioral therapy with Ramirez.  (Admin. R. at 264.)

On January 15, 2010, Reyes reported to Ramirez he was angry, having back pain and not being able to sleep.  (Admin. R. at 283.)  Reyes stated his energy was slow; that Trazadone and Trileptal medications were not helping; and that he stopped smoking and had attended his son's wrestling match.  (Admin. R. at 283.)  Ramirez's diagnosis remained unchanged from her assessment on January 29, 2009.  (Admin. R. at 283-282.)

On February 19, 2010, Reyes reported feelings of "hopelessness regarding being able to get out of the house and lead a 'normal' life", although he recognized some improvement in mood and sleep.  (Admin. R. at 281.)  Ramirez characterized Reyes's improvement in mood and affect as euthymic[2].  (Admin. R. at 281.)  The diagnosis remained unchanged.  (Admin. R. at 281.)

On March 26, 2010, Ramirez noted that Reyes's anxiety had increased to the point of paranoia and he was not able to sleep.  (Admin. R. at 279.)  Ramirez also noted that Reyes was taking Simvastatin prescribed by Dr. McKellar but that he wanted to look for another primary care physician.  (Admin. R. at 279-280.)  Ramirez's diagnosis remained the same.  (Admin. R. at 279.)   Ramirez's evaluations from April 1, April 15, May 14, and June 4, 2010, note improvement in Reyes's mood, emotional control, and ability to control anger, although her overall diagnosis remained unchanged.  (Admin. R. at 277- 274.)

On July 1, 2010, Ramirez noted unchanged progress and some worsening but there was no difference in her diagnosis.  (Admin. R. at 273.)  On July 22, 2010, Reyes reported depression

_____

[2] Euthymic pertains to a normal mood in which the range of emotions is neither depressed nor highly elevated. Reference.com, http://www.reference.com/motif/health/euthymic (last visited Nov. 15, 2013).

and felt improvement with anger problems as result of medication. (Admin. R. at 272.) Ramirez, however, did not change her diagnosis. (Admin. R. at 272.) Ramirez's last evaluation was on November 18, 2010, and she reported no change in Reyes's depression and emotional regulation stability. (Admin. R. at 270.) Ramirez's overall diagnosis and GAF score remained unchanged. (Admin. R. at 270.)

V.   ALJ Decision

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. In step one, the ALJ found Reyes has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date of disability. (Admin. R. at 14.) At step two, the ALJ determined that Reyes suffered from a bipolar disorder, ADHD, and panic disorder without agoraphobia, as diagnosed by an acceptable medical source. (Admin. R. at 14.)

The ALJ found Reyes's bipolar disorder, ADHD, and panic disorder without agoraphobia to be severe impairments, but that they do not meet or medically equal one of the listed impairments. (Admin. R. at 14.) The ALJ found that Reyes's mental impairments satisfy the diagnostic criteria of Listing 12.04 "paragraph A", because Reyes has a bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture. (Admin. R. at 15.) He also determined that Reyes's mental impairments satisfy "paragraph A" criteria of Listing 12.06 because he reports recurrent and intrusive recollections of traumatic experiences, which are a source of marked distress. (Admin. R. at 15.)

The ALJ found that Reyes has mild restrictions of his activities of daily living, moderate difficulties with social functioning, and moderate difficulties with maintaining his concentration, persistence, and pace. (Admin. R. at 15.) However, because those impairments do not cause at least two "marked" limitations or one "marked" limitation with "repeated" episodes of

decompensation, each of extended duration, the criteria in "paragraph B" are not satisfied. (Admin. R. at 15.)  The ALJ also found that the evidence failed to establish the presence of the criteria to meet "paragraph C", because Reyes does not have repeated episodes of decompensation, nor there is evidence that he would decompensate with even minimal increase in mental demands; and also because Reyes is able to function independently.  (Admin. R. at 15.) Accordingly, the ALJ determined that Reyes's impairments do not meet or medically equal the full criteria of Listing 12.02, Listing 12.04 or Listing 12.06.  (Admin. R. at 15.)

Next, the ALJ determined that Reyes has the residual functional capacity to perform a full range of exertional work.  (Admin. R. at 15.)  The ALJ then determined Reyes was not under a disability within the meaning of the Act from March 1, 2006, through the date of his decision. (Admin. R. at 14.)  The ALJ found that while Reyes is limited to performing unskilled work, he has the residual functional capacity to perform other substantial gainful work available in the national economy.  (Admin. R. at 15.)

The ALJ noted that the only acceptable medical source the claimant met with during the adjudicatory period was Dr. Cole, who conducted only a one-time examination.  (Admin. R. at 18.)  He also noted the record evidenced no treating source opinion regarding Reyes's residual functional capacity.  (Admin. R. at 18.)  Nevertheless, the ALJ considered the treatment notes of Reyes's care providers and gave weight to Dr. Cole's assessment, as well as the mental residual functional capacity finding of the state agency.  (Admin. R. at 18.)

The ALJ determined that a limitation to simple, routine tasks with limited interpersonal contact are consistent with Reyes's ability to continue functioning as a stay-at-home father. (Admin. R. at 18.)  The ALJ explained that Reyes described his problems as lifelong, which

*{JGM}*

would include those periods when Reyes could sustain full-time competitive employment, therefore, accommodations to limited skilled work would be sufficient. (Admin. R. at 18.)

The ALJ acknowledged that Reyes's medical impairments could reasonably be expected to cause some of the alleged symptoms, but held that based on the objective evidence in the record Reyes's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Admin. R. at 19.) He noted that Reyes was cooperative during examinations, even with new providers, and that Reyes's daily activities were not consistent with an individual incapable of sustaining full-time, work-related activities. (Admin. R. at 19.) The ALJ determined that Reyes's choice of vocations prior to applying for disability undermined the alleged severity of his anger problems, given that Reyes reported his problems as lifelong. (Admin. R. at 19.) In addition, the ALJ noted that there was no precipitating event that reasonably would be expected to cause the type of increased symptoms alleged and now make Reyes's lifelong impairments disabling. (Admin. R. at 19.)

The ALJ noted that Reyes's functioning improved with medical compliance and abstinence of marijuana. (Admin. R. at 20.) The ALJ acknowledged that Reyes experiences anxiety in social situations, but found that Reyes's functioning improved as he became more comfortable with a situation. Then he held that a restriction to simple, routine work would allow Reyes to quickly learn the functions of his job. (Admin. R. at 20.) The ALJ determined that Reyes retained the residual functional capacity to perform his past relevant work as a hand-packager. (Admin. R. at 20.) He explained that hand-packaging does not require performance of activities precluded by Reyes's residual functional capacity. (Admin. R. at 20.) The ALJ determined that after fifteen years performing that job, Reyes earned substantial gainful activity level income. (Admin. R. at 20.) The DOT description of that job is consistent with Reyes's

residual functional capacity as it is classified as unskilled job with medium exertion and Reyes has no exertional limitations. (Admin. R. at 20.)

The ALJ based his determination on Reyes's residual functional capacity, age, education, and work experience. Also, based on the testimony of the vocational expert at the hearing, and the Medical-Vocational Guidelines, the ALJ found that Reyes retains the ability to perform other jobs available in the national economy and locally. (Admin. R. at 21.) These include cleaner (medium unskilled work with 3,350,000 jobs nationally and 4,700 locally), laundry worker (medium unskilled work with 23, 7000 jobs nationally and 2,100 locally), and recycler (medium unskilled work with 484,000 jobs nationally and 5,700 locally). (Admin. R. at 21.)

## Standard of Review

The Act provides for payment of various benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), cert. denied, 519 U.S. 881 (1996). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins*, 466 F.3d at 882; *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Thus,

where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

*Discussion*

Reyes asserts that the ALJ: 1) failed to give proper consideration to the treating entities; 2) failed to adequately address his GAF scores; and 3) failed to address the extent of his disability to find that he meets the requirements of Listing 12.03. The Commissioner contends that substantial evidence supports the ALJ's decision and that he properly considered the evidence presented to him in accordance with the terms of the Act and the related regulations.

I.    Consideration to the Treating Entities

Reyes argues that the ALJ failed to adequately address the extent of his disability as outlined by PMNHPs Shapiro and Ramirez and examining psychologist, Dr. Cole.

The weight attributed to the opinion of a medical source is partly dependent on the extent of the professional relationship between the physician and the claimant. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001). Usually, the opinion of a treating physician carries more weight than an examining physician's opinion, which in turn carries more weight than that of a physician who did not examine the claimant but formed an opinion based on a review of the claimant's medical records. *Holohan*, 246 F.3d at 1201-1202. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005).

To establish a physical or mental impairment, Reyes must provide evidence from "acceptable medical sources", which are the only ones who are considered treating sources and accorded great or governing weight. See 20 C.F.R. § 416.927(c). Medical sources that are not listed as an acceptable medical source are considered "other sources." 20 C.F.R. § 416.913(d)(1). *Mack v. Astrue*, 918 F. Supp. 2d 975, 982 (N.D. Cal. 2013).

> The Code of Federal Regulations (the "Code") provides that:
>
> In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to --
>
>> (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists): * * *.

20 C.F.R. § 404.1513(d) (2007). In *Gomez*, 74 F.3d at 970-71, the Ninth Circuit concluded that the different treatment afforded to "medical sources" in the Code permit the Commissioner to accord opinions from "other sources" less weight than opinions from "acceptable medical sources." Also, in *Brown v. Massanari*, 231 F. Supp. 2d 1011, 1018 (D. Or. 2001), the court found that under the Code, "an ALJ's right to rely on the opinion of a physicians' assistant is limited to his consideration of the severity of the impairments and how the impairments affect the claimant's ability to work." *Id.* Yet, in light of the growth of managed health care and medical costs, the opinions of those who are not "acceptable medical sources, which include nurse practitioners, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." *Thomas v. Astrue*, CV 07-8040-PLA, 2009 WL 151488, * at 5 (C.D. Cal. Jan. 21, 2009)(citing SSR 06–03p).

The record shows that the ALJ properly accorded sufficient weight and consideration to Shapiro's diagnosis and observations, which were generally consistent with that of other medical

sources. (Admin. R. at 17.) Shapiro's overall assessment, standing alone, cannot support a finding of disability because he did not meet with Reyes on a regular basis during the relevant period to fully determine Reyes's disability and improvements or remissions over time. Shapiro's observations and conclusions alone are insufficient to prove disability within the meaning of the Act. Furthermore, the record does not establish that Shapiro is an agent of an acceptable medical source; or that a close supervisory or agency relationship existed between Shapiro and an acceptable medical source required to be entitled to greater weight than he was given. *Mack*, 918 F. Supp. 2d at 983.

Similarly, the record supports that the ALJ accorded sufficient weight and consideration to Ramirez's observations as a PMHNP. Accurately, the ALJ noted that Ramirez's diagnosis remained the same throughout her different evaluations even when Reyes reported improvement. (Admin. R. at 18.) Because Ramirez is not an "acceptable medical" source under the regulations, the ALJ was not required to give governing weight to her observations and conclusions. Although the professional relationship between Ramirez and Reyes has been the longest on record, the ALJ reasonably concluded her observations should be not fully credited given that her assessment did not change as Reyes's conditions did.

In contrast, the ALJ correctly noted that Dr. Cole is the only acceptable medical source who met with Reyes. Dr. Cole's diagnosis did not differ significantly from the observations of other sources. Dr. Cole's assessment that Reyes was able to perform simple, routine tasks and simple multi-step tasks is consistent with Reyes's choice of past relevant work and testimony. Together, that provides sufficient evidence to determine that Reyes's impairments are not disabling. Reyes is able to take care of his personal needs, prepare meals for his family, do housework, and shop for some groceries, and the ALJ reasonably concluded that his ability to

perform such activities is inconsistent with the presence of a condition which would preclude all work activity. Moreover, Reye's capacity to adapt was assessed as "not significantly limited", (Admin. R. at 258), which supports the finding that he can perform low-skilled, unsupervised work outside his home.

The ALJ properly gave "great weight" to Dr. Cole's assessment even though Dr. Cole met with Reyes for only a one-time examination. (Admin. R. at 18.) The mental residual functional capacity finding of the state agency, Reyes's testimony of his "lifelong impairments", and the weight accorded to the different medical sources, all support the ALJ's determination.

II.   GAF Scores

Different medical sources assigned different GAF scores in their assessment of Reyes. On January 9, 2009, Shapiro assigned a GAF score of 43, and on January 28, 2009, he assigned a GAF score of 48. (Admin. R. at 214 and 219.) On April 9, 2009, Ramirez assigned a GAF score of 40, which remained unchanged until November 18, 2010, when Reyes last visited Ramirez. (Admin. R. at 293.) On August 28, 2009, Dr. Cole assigned a GAF score of 54. (Admin. R. at 240.) In his decision, the ALJ did not explicitly address the different GAF scores assigned, but this was not harmful error.

GAF scores are relevant to assess a claimant's ability to work but they are not dispositive. *Garcia v. Astrue*, CIV S-10-0259 GGH, 2011 WL 4479843, at *5 (E.D. Cal. Sept. 26, 2011). GAF scores are not conclusive of disability for Social Security purposes. *Thomas*, 2009 WL 151488, at *6. The ALJ is required to read treating physician's notes in context of the overall diagnosis given. *Holohan*, 246 F.3d at 1205. The ALJ need not discuss all of the evidence presented in the treatment record, although the ALJ is required to "explain why significant

probative evidence has been rejected." *Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir. 1984).

The Social Security Administration has not endorsed the GAF scale for use in the Social Security and SSI disability programs, and has indicated that GAF scores have no "direct correlation to the severity requirements in the mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. § 50746–01 (Aug. 21, 2000); *Thomas,* 2009 WL 151488, at *6. Although mental health practitioners use GAF scores to track the clinical progress of an individual, "the ALJ is not bound to consider its results at the exclusion of other medically reliable evidence." *Mitchell v. Astrue,* ED CV 09-1258-PLA, 2010 WL 1994695, at *9 (C.D. Cal. May 14, 2010). GAF scores are also not determinative with respect to an individual's residual functional capacity determination. *Thomas,* 2009 WL 151488, at *6. Although, multiple GAFs assessed over a period of time by the same or different examiner, are more instructive than a singular one. *Garcia,* 2011 WL 4479843, at *5 (2011).

For instance, in *Garcia,* 2011 WL 4479843, at *3 (2011), claimant was diagnosed with "bipolar disorder, Not Otherwise Specified, and ADHD" and his problems included "anxiety, anger, and difficulty concentrating." *Id.* at *5. One psychiatric report indicated a GAF score of 60 and eight months later his examining psychiatrist assessed a GAF score of 45. *Id.* at *4. The ALJ found "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." *Id.* at *1. Upon review, the court considered GAF scores as "merely a snapshot in time" and "of very limited usefulness due to their failure to translate into concrete functional limitations." *Id.* GAFs "do not positively assess a [claimant's] ability to work." *Id.* at *4. Notwithstanding, the court noted the record was "a four-year history of fairly regular

monthly visits [claimant] had with his psychiatrists as well as the on-going medications prescribed to treat his condition(s)." *Id.*   The court determined that claimant's "inability to function in a working environment [was] adequately supported by the record", and "that the ALJ [had] improperly" undermined the treating psychiatrist's evaluations and "substituted [them with] his own assessment of [claimant's] psychiatric limitations." *Id.* at *11.

Similarly, in *Haynes v. Colvin*, ED CV 12-2208-PLA, 2013 WL 5575115 (C.D. Cal. Oct. 10, 2013), the record showed a four-years history of treatment, a total of nine GAF scores, and that claimant had been on medication. *Id.* at *3, *5.   The court considered the ALJ erred in not considering the "numerous limitations included in the treating physicians' notes" and in failing to discuss the reason for rejecting the physicians' opinions that "clearly translate[d] into functional limitations." *Id.* at *4.   The court found that claimant's "GAF scores [were] particularly relevant because they were provided over a period of several years by multiple treating doctors and frequently reflect[ed] assessments indicating moderate to major limitations." *Id.* at *5.   The court noted that the ALJ erred in giving no weight or "considered the implications of, [the] multiple [GAF] scores in the 40–50 range." *Id.*   Also, in *Mann v. Astrue*, EDCV 08-1338 AN, 2009 WL 2246350, *2 (C.D. Cal. July 24, 2009), the court considered the claimant's GAF score of 50 unreliable as the treating doctors' notes and reports "collectively contradict[ed] and fail[ed] to support a finding that [claimant's] GAF was 50" on the day of the evaluation and it was "certainly" not for a "continuous twelve month period." *Id.*

As these cases illustrate, the reliability of GAF scores is related to the period of time between their assessments, in light of other findings in the record.   Reyes's assessment was done for a period of two years, not all examiners were acceptable medical sources and their assessments were given after a first or second-time examination.   Ramirez was the only constant

examiner but, as stated below, her assessments are not fully reliable. The frequency here is not as extensive as that in *Garcia* or *Haynes* to reliably show a constant in Reyes's condition, or support finding an impairment or condition so severe as to limit Reyes's ability to perform some jobs available in the local or national economy. In contrast with *Haynes*, the physicians' notes and observations in this case were what led the ALJ's conclusion instead of the physicians' conclusions alone. The record does not show that the ALJ simply substituted the examining physician's opinion for his own assessment.

Reyes's GAF scores generally reflect assessments indicating moderate limitations and fall within a close range, but they do not reflect Reyes's improvement with time that the examining physicians' notes show. The highest GAF score was 54 given by Dr. Cole, and although she is an acceptable medical source whose opinion was given great weight, the score was based on a one-time assessment. His psychodiagnostic evaluation reflects Reyes's "engaged and cooperative attitude", and although Reyes had problems with attention and concentration, there were no errors in the multi-step tasks. Reyes reported anger but he did not report problems with pain, other than back pain, or any suicidal or paranoid ideations. Reyes was oriented, with good mood, congruent and with fair judgment. (Admin. R. at 237-240.) Notwithstanding, the 54 GAF score, which indicates "moderate symptoms or moderate difficult[ies]", was given on August 28, 2009, near the date Ramirez assigned Reyes a GAF score of 40, which indicates "some impairments in reality testing or communication" or "major impairment" in social interactions.[3] These inconsistencies undermine the scores' reliability and support the court's view in *Garcia* that GAF scores are "a snapshot in time." 2011 WL 4479843, at *4 (2011).

---

[3] *See supra* note 1 for symptoms and impairments related to each range of GAF scores.

*{JGM}*

Furthermore, the GAF scores' reliability is also undermined because they are inconsistent with the examining physicians' notes.    For example, Ramirez assigned the same GAF score throughout her examinations, even when Reyes reported improvements in his condition. Ramirez's notes include Reyes's expressed willingness to seek help for his problems with anger, a positive reaction to medication, a cooperative attitude, and a "significant decrease in anger and some improvement in depression." (Admin. R. at 271.)    Yet, Ramirez's diagnosis remained always the same.  Also, Shapiro assessed GAF scores of 43 and 48 but noted that Reyes was able to stop his hyperactivity long enough to focus and concentrate to execute the tests at hand during his examination.

The overall findings in the record do not indicate the serious impairments in social, occupational, and school functioning (e.g, inability to keep a job) that are associated with the other GAF scores given in the 40s range.  *See* DSM–IV, at 34 (4th ed. 2000).  The record supports the ALJ's conclusion that Reyes is able to work while limited to performing simple repetitive tasks requiring no interaction with the general public. While the ALJ was required to explain evidence that has been rejected, the GAF scores, in this case, do not represent significant probative evidence that demonstrate the ALJ's finding to be deficient or unsupported.  In light of the record as a whole, any error in failing to do so was harmless.  Therefore, the ALJ did not err in not giving great weight to the GAF scores or by failing to address them in his determination. *See Thomas*, 2009 WL 151488, at *4-5 (finding no error of ALJ rejecting GAF score of 50 when it was unsupported by the claimant's overall evaluation).

III.    Listing Requirements

Reyes claims that the ALJ failed to find that his condition meets the requirements of Listing 12.03.  The ALJ did not address Listing 12.03, but instead considered Listings 12.02,

12.04, and 12.06. The ALJ found that Reyes's medically determinable mental impairment of ADHD does not satisfy the criteria of Listing 12.02, "paragraph A". The ALJ found that Reyes's bipolar syndrome and history of manic and depressive syndromes satisfy the criteria of Listing 12.04, "paragraph A". Also, the ALJ found that the criteria of Listing 12.06, "paragraph A" was satisfied because Reyes reported recurrent and intrusive recollections of traumatic experiences, which are of a marked degree. (Admin. R. at 15.) However, the ALJ concluded that Reyes did not meet "paragraph B" criteria because Reyes's mental impairments do not cause at least two "marked" limitations or one "marked" limitation with "repeated" episode of decompensation.

The conditions included in the Listing are considered so severe that they are irrefutably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs. 20 C.F.R. § 404.1520(d). Claimants are conclusively disabled if their condition either meets or equals a listed impairment. 20 C.F.R. § 404.1520(d); *Lester*, 81 F.3d at 828.

In determining whether a claimant with a mental impairment meets a listed impairment, the Commissioner considers: (1) whether specified diagnostic criteria ("paragraph A" criteria) are met; and (2) whether specified functional restrictions are present ("paragraph B" criteria). 20 C.F.R. § 404.1520a. The claimant's mental impairment must satisfy both the paragraph A and paragraph B criteria to meet the listings. *Lester*, 81 F. 3d 821. Paragraph B of Listings 12.06 and 12.03, involve the effects of those symptoms and the requirements are identical for both sections. *Frost v. Barnhart*, 314 F.3d 359, 363 (9th Cir. 2002). Even though the ALJ did not consider section 12.03, that omission is immaterial because not satisfying section 12.06 means that 12.03, paragraph B, could not have been satisfied had it been considered. The alternative means for proving disability that section 12.03 provides under paragraph C also was not met.

The criteria in both sections "describe impairment-related functional limitations that are incompatible with the ability to do *any* gainful activity." 20 C.F.R. § 404app. 1 (emphasis added).

The mental disorder under Listing 12.03, Schizophrenia, Paranoid and Other Psychotic Disorders, requires the criteria of both paragraphs (A), medical findings, and (B), impairment-related functional limitations, to be satisfied, or alternatively, the criteria of (C) to be satisfied. The requisite listing-level severity is satisfied by two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. *Id.* at 12.03(B). Paragraph C of Listing 12.03 requires:

> "medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and . . . (1) repeated episodes of decompensation, each of extended duration; or (2) A residual disease process resulting in marginal adjustment . . . ; or (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03; *Santistevan v. Astrue*, 09-CV-804-BR, 2010 WL 3420158, at *7 (D. Or. Aug. 27, 2010).

A "marked" limitation is defined as a "more than moderate" but "less than extreme" interference with a person's ability to independently initiate, sustain, or complete activities. 20 C.F.R. Part 404, Subpart P. Appendix 1, Listing 12.00(C); *Calvillo v. Astrue*, CV 12-07558-VBK, 2013 WL 3200508, at *3 (C.D. Cal. June 24, 2013); *Santistevan*, 2010 WL 3420158, at *6. "Activities of daily living include" adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your

grooming and hygiene, using telephones and directories, and using a post office. 20 C.F.R. § 404 app. 1.   Paragraph C, Listing 12.03, demonstrates disability by those who previously met the section's standards and whose symptoms have been treated by medication but who still could not function alone in a work environment. *Frost*, 314 F.3d at 363.  To find a listed impairment, both the diagnostic description and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment must be satisfied. 20 C.F.R. § 404app. 1.

The ALJ considered that Reyes has mild restrictions of his daily activities, moderate difficulties with social functioning, and moderate difficulties, but not marked impairment, with maintaining his concentration, persistence, and pace. (Admin. R. at 15.)   In reaching that conclusion, the ALJ considered Reyes's daily activities as a stay-at-home father for his three children; his ability to attend to his personal care needs as well as those of his children; his past choice of relevant work; his problems handling money; and his difficulty getting along with others.

While Reyes described his impairments as lifelong, he alleged an onset date of March 1, 2006, but presented evidence dating back only to November 21, 2008.  The record as a whole evidences Reyes's limitations but it also shows they are not so severe as to be disabling.  The record also shows that Reyes has deficiencies of concentration persistence or pace, although they are not severe since Reyes is capable of performing important daily tasks, such as cooking and child caring, and was able to perform the tasks given during examinations.   Many alleged lifelong symptoms improved with medication and therapy, and Reyes was able to sustain past work and form a family while coping with the symptoms before his application for Benefits. Furthermore, Reyes was able to work and raise a family without treatment until December 2008, when he was first treated.  (Admin. R. at 253-254.)

The ALJ also determined that the criterion for "paragraph C" is not satisfied because there are no "repeated episodes of decompensation" with even a minimal increase in mental demands, and Reyes is able to function independently. The record shows that Reyes's anxiety and stress increases in social interactions but his good response to medication and his ability to handle therapy and meet with different medical practitioners did not support a finding of "a residual disease process resulting in marginal adjustment" or inability "to function outside a highly supportive living arrangement" as paragraph C requires. *Santistevan*, 2010 WL 3420158, at \*7. In fact, this evidence supports the conclusion that Reyes is able to control his anxiety for important tasks and his activities of daily living are not markedly impaired. Reyes also does not show a chronic schizophrenic, paranoid, or other psychotic disorder or any medically documented history that would support such finding.

While Reyes's emotional withdrawal or isolation are marked, they do not amount to the "medically documented persistence" required under Listing 12.03, because although it is alleged that his condition has gotten worse, the evidence shows that he was responding positively to medication and therapy, and he was able to sustain basic social functions before. Reyes is also able to care appropriately for his grooming and hygiene, and to care for his children. Furthermore, albeit he expressed dislike for being around people and being told what to do, Reyes is able to function alone in a work environment and with little supervision.

Furthermore, the record shows that Reyes's condition improved with abstinence from marijuana. It can be reasonably assumed that Reyes's depression and poor sleep stem, in part, from the same stressors identified by medical sources. In particular, Reyes stated feeling "hopelessness regarding being able to get out of the house and lead a 'normal' life", which signals back to the identified stressors that could be perpetuating his condition. (Admin. R. at

281.)  Reyes's mental condition does not render him incapable of leaving his home or being unable to sustain a low-skilled employment with no contact with the general public.  The medical evaluations do not show that Reyes is unemployable or incapable to work.  Reyes's limitations do not satisfy two of the required criteria under Listing 12.03, and he does not offer an argument indicating otherwise.

### Conclusion

The Commissioner's findings on Reyes's disabilities, considering the record as a whole, are supported by substantial evidence.  The decision of the Commissioner should be affirmed.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **December 21, 2013.**  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th day of December, 2013.

JOHN V. ACOSTA
United States Magistrate Judge